*McArthur *v.* Faw.

*(Knoxville,* September Term, 1945.)

Opinion filed January 19, 1946.

Petition for Rehearing Dismissed March 2, 1946.

_____

*Certiorari denied by U. S. Supreme Court, Nov. 18, 1946, 19 L. ed. (adv. op.) 79.

506

SIMMONDS & BOWMAN, of Johnson City, CLYDE W. KEY, of Knoxville, and PRENTICE COOPER, of Shelbyville, for complainant.

COX, TAYLOR, EPPS & MILLER and CHASE & NEEL, all of Johnson City, for defendant.

MR. JUSTICE CHAMBLISS delivered the opinion of the Court.

It is sought by this suit to enforce specific performance of an oral two year option, given by William W. Faw to M. T. McArthur, without consideration, in January 1941, for the purchase of stock in the John Sevier Hotel Corporation of Johnson City, upon the charge that the option was bindingly accepted by the tender and receipt of the stipulated price. It was insisted for the seller, among other defenses, that the option agreement was subject to certain material conditions which were never complied with. The chancellor denied relief on several grounds and dismissed the suit. The court of appeals reversed, apparently taking the view that the conditions were substantially met by or on behalf of the proposed purchaser, before the expiration of an extended time limit, or a withdrawal of the offer, and that the right to enforcement of the option contract thereupon accrued, and likewise overruling the chancellor as to other defenses relied on, entered a decree. We granted *certiorari*.

Giving full recognition to the evidence set forth in the opinion of the court of appeals touching preceding conversations and oral negotiations between the parties, beginning early in 1941, as to the offer of sale by Faw to McArthur of an interest in stock Faw then purchased in the hotel company, it is clear that, prior to February 10, 1943, when McArthur remitted to Faw his check for $16,000, no enforceable contract had arisen obligating Faw to sell to McArthur the stock. That is to say, had Faw promptly returned this check and expressed his refusal to sell to McArthur, this would have concluded the matter. This is recognized in McArthur's previous letter of January 29, 1943, suggesting a written contract, etc. And McArthur testifies he had written Faw in September, 1942, after advice from his attorneys that his verbal op-

tion was enforceable for several reasons, that he knew Faw was not legally obligated to carry out his verbal option agreement. It was at this time that McArthur first offered to bind himself. He had waited nearly two years, free to buy or not as conditions might prove to dictate, while Faw was taking the chances of success or failure of the enterprise.

The first question for consideration, therefore, is: Did the receipt by Faw of this check and his retention thereof constitute, as argued for McArthur, a binding acceptance on his part, giving rise to a contract enforceable in equity?

Immediately upon receipt of the check Faw wrote from his home in Gainesville, Georgia, a letter addressed to his attorney, Guy S. Chase, in Johnson City, and at the same time wrote McArthur and sent a copy thereof to him. Faw did not cash the check, but forwarded it immediately to his attorneys with instructions to hold it pending the "working out" of a definite agreement with McArthur covering several mentioned material conditions and the preparation of a written contract of sale and purchase to be executed by McArthur and himself. It thus appears that, if receipt and retention of this check was an acceptance at all, it was conditional only. In view of its indicated importance, this letter follows, the italics being inserted:

"February 13, 1943.

"Hon. Guy S. Chase,

"Johnson City, Tennessee.

"Dear Judge:

"It being impossible for me to get to Johnson City at this time, I want you to handle a transaction between Mr. M. T. McArthur and myself, involving stock in the John Sevier Hotel Corporation.

"Of that stock I own 306½ preferred and 463 3/10 common shares, plus one share common, recorded in the name of H. D. Gump and 9/10 share common recorded in the name of C. H. Brown.

"When I bought this stock two years ago, part from H. D. Gump and part from Sam Sells, Mr. McArthur owned 43 4/5 preferred and 40 shares common. He has since acquired as agreed additional shares for our joint account, at prices and in numbers of which he will advise and which are to be taken into account in an equalization of shares between us.

"At the time I bought this stock Mr. McArthur and I had an understanding that *under certain conditions* he would have an option for two years from that date to buy from me a sufficient number of my shares to make us own an equal number of each class of shares, taking into consideration any shares which either of us may have acquired in the meantime.

"This price of the stock so optioned to Mr. McArthur is $100.00 a share for the preferred and $35.00 a share for the common, with 3% yearly interest on the common from the time I purchased it until the option might be taken up by Mr. McArthur.

"This sale by me and the purchase by Mr. McArthur *is conditional* on our each having a continuous and everlasting option on all of the other's stock in case either should die, should want to sell or be forced to sell any or all of his shares. This option price being $100.00 a share for the preferred and $35.00 a share for the common, plus 3% yearly interest on the common from the date this presently contemplated sale is made, with two years to pay after this option might be exercised. A further consideration being that if either of us exercise any opportunity to buy additional shares they will be bought for

our joint account if we both so elect and will thereafter be subject to the conditions of this joint option.

"Our object is to devise a plan whereby we will always have an equal interest in the corporation and *to safeguard our holdings* in such a way that the stock can never get out of our hands. Neither of us want to ever get in the position of having to bid for his stock in an open market to retain control of the corporation.

"At the present time I do not own actually fifty-one percent of the stock, but do own enough to give me a practical working control. I am willing to share this with Mr. McArthur, *but only under contractual assurance* that it will never get out of our hands. I think that is the same assurance Mr. McArthur wants and that is what I want you to provide for us.

"Based on the information I have given you and as it may be supplemented by Mr. McArthur, I want you to work out this agreement since *he wishes* to exercise his option and buy a sufficient amount of my stock so that we will own an equal amount. He has sent me a cashier's check for $16,000.00 and you and he can determine what balance might be due.

"*When this has been done,* place in escrow his cashier's check for the balance and sufficient stock certificates of mine *until a satisfactory and safe agreement has been arrived at.* You might also better place along with them the $16,000.00 check which I will mail to you Monday with my stock certificates.

"Just how you will arrive at what we want accomplished I do not know. It may be that we should both place all our stock in the hands of a trustee who will hold it indefinitely. Should either of us be free to encumber our portion of the stock at will, it would certainly make an option inoperative and of little assurance.

"Please keep me advised of your progress and when you are ready I may then be able to get up there. I have been so short handed here that I am closer tied down than I have been for the past eight years.

"I will send you my stock certificates and the check Monday. I will want to register them and the Post Office is closed at this hour.

"Very truly yours,<br>
"William W. Faw

"P. S. I have sent Mr. McArthur a copy of this letter and have asked him to go into this right away, since the essence of an option is promptness."

The opinion of the court of appeals states the facts of the case with the clearness and accuracy characteristic of the learned writer, and we have no quarrel with its statement of general legal principles. However, it is touching these "conditions" of Faw's proposal, their nature and relevant importance, and whether or not complied with, that we find ourselves in disagreement with the learned court of appeals.

Faw sets forth in this letter of February 13th, above quoted, said by the court of appeals to be the first binding basis of contract, two major conditions, (1) that an arrangement must be arrived at by which each of the parties would have "contractual assurance" of the optional right to purchase the stock of the other in the event of either a voluntary, or forced sale, before or after death and good against creditors, and (2) at the fixed price of $35 for common stock and $100 for preferred.

It will be seen that this letter of instructions from Faw to his attorney (copy going to McArthur) states with unusual clearness and much emphasis what these conditions are and their determinative importance. It appears from a statement in this letter that Faw's original pro-

posal to sell to McArthur was subject to these conditions and the court of appeals finds this to be sustained by the weight of the proof. So that, insistence upon these conditions was nothing newly injected into the negotiations by Faw in an effort to evade and avoid performance of an oral agreement he had made. The financial difficulties McArthur is shown in the record to have experienced, and his then financial condition, justified the caution Faw showed and his insistence upon protection in case of McArthur's death or insolvency.

Promptly upon receipt of Faw's letter of instructions, his attorney, Chase, and his partner, Neel, did two things, (1) entered into negotiations with McArthur to secure his approval of the terms and conditions set out in Faw's letter and (2) began an investigation into the legal question whether or not the parties could so contract as to assure the option rights of each other against the creditors of the other, and thus afford that "contractual assurance" desired.

They found McArthur in full accord as to these "conditions," except with respect to the provision for a fixed price for the stock if and when sold under this continuing mutual option. As to this he strongly contended over several months for a basic price to be determined by the book value at the time of sale. Faw held to his demand for a fixed price. Quite apparently their minds had never met on this issue. Finally, finding Faw still insistent, McArthur yielded this controverted point and his attorneys so notified Faw's attorneys, but not until July 23, 1943, at the same time presenting a written contract which, *in the opinion of McArthur's attorneys*, but not concurred in by Faw's attorneys, provided the "contractual assurance" desired by both parties for the con-

tinuing mutual option to purchase the stock of the other, good as against creditors of either.

Now, we understand the court of appeals to concede that up to the submission to his attorneys of this draft of a contract, Faw had the right to withdraw his offer. This Faw claims to have done and his attorneys testify that they had so notified Judge SIMMONDS, who had been retained on July 17th by McArthur to represent him in the negotiations, in an interview between these attorneys on July 21, 1943. As to this there appears to be a sharp conflict in recollection between the respective counsel, Chase and Neel, testifying that they so notified Judge SIMMONDS, attorney for McArthur, on this occasion, and he testifying to the contrary. The court of appeals does not appear to have definitely resolved this issue of fact, apparently giving determinative significance on this point to the fact that the check was not returned to McArthur until several days later, while, meanwhile, Judge SIMMONDS had presented to Chase and Neel (on July 23d) his draft of a contract, above mentioned, in which it was offered by McArthur to meet the condition contended for by Faw of a fixed price on the stock.

While we are inclined to the view that the exact date of the return of the check is not of controlling importance, if the weight of the evidence is that Faw had withdrawn his offer and his counsel had so notified Judge SIMMONDS before the presentation of the contract in which McArthur abandoned his contention for an option price based on book value, we find it unnecessary to discuss this phase of the case further, in view of our conclusion as to the decisive importance of another issue to be now considered.

■■ With due deference to the apparently contrary conclusion of the learned court of appeals, we are of

opinion that the condition for "contractual assurance" that the mutual continuing option of purchase should be good against the claims of creditors was (1) an absolute and essential condition, and that (2) this condition was not met, and that on this determinative issue Faw acted in good faith; that he had a clear right to exact compliance with this condition, and having consistently and steadfastly done so, no enforceable contract arose affording a basis for a decree for specific performance. Not only did Faw have a right to rely and act upon the view and advice of legal counsel on this involved and somewhat legal question, having referred the matter to them in his letter of February 13th and thus indicated his purpose to do so, but we are of opinion that the attorneys, whose professional obligation it was to advise Mr. Faw, could not, with any degree of safety, have advised him that either the plan submitted to them by the legal representative of Mr. McArthur, or any other open to them, would have afforded protection to the parties against the intervening rights of creditors in the possible event of insolvency. If for no other reason, this is so because it is apparent that such a protective plan against the claims of future creditors would contravene the Uniform Fraudulent Conveyances Law, our Code, Section 7277, reading as follows: "Conveyance made with intent to defraud.—Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud, either present or future creditors, is fraudulent as to both present and future creditors."

Construing this code provision we recently said, in *M. & N. Freight Lines* v. *Kimbel Lines, Inc.*, 180 Tenn. 1, at page 4, 170 S. W. (2d) 186: "In applying this statute it is necessary only to find an actual intent to hinder and

delay present or future creditors. . . . It is sufficient . . . . if it appears that the purpose, motive or intent was to hinder and delay. It need not appear that there was an intention ultimately to defraud."

■ Now it could never be denied that a material and declared purpose of the agreement or plan was to secure and maintain indefinitely a preference in favor of each party as against future creditors of the other; each party to enjoy the income from his investment without interference by his creditors, so long as the parties thus mutually interested might elect to continue the arrangement. Meanwhile, creditors are blocked, hindered and delayed, and, in the event of bankruptcy of either party, the other would have the right to take over the stock of the other at a fixed price of $35 and $100 per share, respectively, without regard to what greatly increased value this asset of the insolvent might then have.

The opinion in the case above cited discusses this statute fully and cites many authorities for the holding, much in point here, thus expressed in 24 Am. Jur., Fraudulent Conveyances, Sec. 11, p. 170: "If, however, the intention to hinder and delay creditors is not only present in the mind of the debtor, but is also the object and constitutes a part of the cause for the execution of the conveyance, the transaction is void. Furthermore, this intention need not be the debtor's primary, active, controlling purpose; it is enough if it is one of the purposes which was entertained, either directly or as incidental to a more active purpose."

That the purpose was to protect against creditors is made very plain in the letter of Judge Simmonds of July 23d transmitting his proposed draft of a contract. We quote, italicizing certain language: "After discussing the matter with you gentlemen and getting your idea and

the ideas of Mr. Faw, we have drafted a contract which in our opinion meets the conditions mentioned in Mr. Faw's letter of February 13th, and gives Mr. Faw and Mr. McArthur an option on the stock of each, and meets the objection which you gentlemen raised *that the rights of creditors might intervene to defeat the option.* Where the stock is deposited with a trustee and a lien declared thereon in order to guarantee the performance by the proposed seller of his option to the proposed buyer, and a beneficial interest created in the stock, there is no doubt in our minds that *the option is good against the claims of creditors or anyone else.*"

■ Judge SIMMONDS' opinion was apparently influenced, as suggested elsewhere in his letter, by his conception that the relationship between Faw and McArthur was that of a partnership, a view which the court of appeals rejected, in the following language, in which we concur: "We find the evidence insufficient to support either the theory of a joint enterprise, or partnership relation, or to charge defendant as trustee. It is true the stock was purchased in furtherance of the common purpose of the parties to gain control of the corporation, but neither had any proprietary interest in the stock purchased by the other or control over purchases made by the other. A further reason for this conclusion is that there was no reciprocal sharing in the profits and losses of stock purchased. *Memphis Natural Gas Co.* v. *Pope et al.,* 178 Tenn. 580, 161 S. W. (2d) 211."

In point on the principle involved is the decision in *Dunlop* v. *Baker et al.,* 4 Cir., 1916, 239 F. 193, 198, 199, where rights of an option holder are discussed as against creditors of optionor in bankruptcy. The holding was without reference to the Fraudulent Conveyance Law, the case having been decided in 1916, before its enact-

ment, and no purpose to defeat or delay creditors appeared. Nevertheless, the court said: "Finally, we think these conclusions may be stated as evident: Before the petition in bankrupty, Dunlop had an option on the land, good and enforceable against Baker. After the filing of the petition in bankruptcy, the right of Dunlop became subordinate to the superior lien of the trustees, to the extent of the bankrupt's debts and the costs of the proceedings. When Dunlop filed his petition to be allowed to exercise his option, and to protect it by paying into court, not only the option price, but a sum which, together with the price, would satisfy the debts and costs, equity required that he be allowed to pay in the money and to have a conveyance of the property. As holder of a claim to the property subordinate to the lien in favor of the trustees for the benefit of creditors, under a familiar equity rule, he had the right to be subrogated to the rights of the trustees and creditors upon payment of all debts and costs."

▮ Again, from yet another point of view, the plan for providing "contractual assurance" against creditors outlined in the form of contract submitted by counsel for McArthur appears to be vulnerable. It called for placing in trust the stock embraced in the continuing option, thus to insure the desired right to each of the parties to acquire at any future time the holdings of the other at a fixed price, whatever might be its actual value at that time. By this pooling of the stock a sort of Siamese twins reciprocal trust would be created by which the stock of both parties would be indefinitely protected from creditors of either. Would we not have here a form of "spendthrift", in which the several trustors would be the beneficiaries? Each would enjoy unlimited protection from the claims of his creditors by virtue of this trust to which

each had contributed. Would not this be a violation, in principle, of the well-settled limitation upon the doctrine of spendthrift trusts that the trustor may not be his own beneficiary? In *Memken Co.* v. *Brinkley,* 94 Tenn. 721, 731, 31 S. W. 92, 95, the Court.said: "It is a general rule that all property to which a debtor has a right may be subjected to his debts, unless the state shall seek to exempt a portion of it. *Hawkins* v. *Pearce,* 11 Humph. 44, [30 Tenn. 44]." A headnote to. this case (prepared by the Court) reads: "The case of *Jourolmon v. Massengill,* 86 Tenn. 81, 5 S. W. 719, determining that, under the act of 1832 (Code, Section 4283), one person may convey property in trust for the benefit of another, and so limit and restrict it as to exempt it from the debts of the beneficiary thereafter created, does not authorize the creation of such a trust by a person for his own benefit."

Without discussion of other questions, being satisfied that it was within the contemplation of the parties, and a material condition of the option, that provision should be made for a continuing option on the stock of each party in favor of the other by contract valid as against creditors of the other, and that, despite good faith efforts, no such contract has been devised, we are constrained to reverse the decree of the court of appeals and dismiss the bill.

### On Petition to Rehear.

PER CURIAM:—A petition to rehear is filed by McArthur in which we are asked to reconsider our opinion and set aside the decree entered herein by this Court.

The first ground of the petition is that the Court lost jurisdiction of the case after denying the petition for *certiorari* directed to the decree of the court of appeals

and denying a petition to rehear and reconsider that denial. A second petition to rehear was filed which the Court permitted and upon consideration of the second petition *certiorari* was granted and the case set down for argument.

▮ A procedendo issued from the court of appeals, while the first petition to rehear was pending in this Court, remanding the cause of the Chancery Court of Washington County and the *procedendo* was filed in that court. This was an inadvertence, the clerk has advised us, and many cases (84 A. L. R. 591) hold that a *procedendo* or mandate issued under such circumstances may be recalled or stayed. The latter action was taken by this Court.

▮▮ While rarely entertained, a second petition to rehear has in exceptional cases been permitted and there is no rule or statute denying such authority to the Court. In this particular case some members of the Court were sick, not present when the first petition to rehear was under consideration, and the full Court being assembled thought that the second petition to rehear should be entertained, *certiorari* granted, and the case argued. This was accordingly done. As a matter of fact, this Court never took jurisdiction of the cause until after the second petition to rehear was granted and the writ of *certiorari* to the court of appeals awarded. The case not having been in this Court until the writ of *certiorari* was granted, sections 8867 and 10531 of the Code are not applicable to procedure here. The Court had power at the same term to correct its previous orders as to grant of *certiorari*.

▮ Chapter 100 of the Acts of 1925 creating the Court of Appeals and providing the revisory jurisdiction of this Court does not limit the time in which this Court shall

act upon a petition for *certiorari* directed to the action of the intermediate court. Petitions for *certiorari* must be filed in a limited time but no time is prescribed for the disposition of these petitions. The powers of this Court necessary to the exercise and enforcement of its jurisdiction are very broad. Section 10637 of the Code is as follows: "The court may appoint receivers, order references and issue all writs and process necessary for the exercise and enforcement of its jurisdiction."

The Court having concluded that it properly should have taken jurisdiction of the cause and granted the petition for *certiorari*, and the time in which it might grant the writ to review a decree of the court of appeals not being limited, acted within its power in granting the writ upon becoming satisfied of a mistake in its former refusal. Having taken jurisdiction of the cause, the Court had full authority, under Code Section 10637 above cited, by way of exercising and enforcing its own jurisdiction to stay proceedings under the *procedendo* irregularly issued from the Court of Appeals.

We find it necessary to respond but briefly to the complaint directed to our disposition of the merits.

Having reached definitely the conclusion that a material condition imposed by Faw upon his acceptance of the option given McArthur was that a contract must be drawn which, in the opinion of his legal counsel, would afford him assurance that his right of repurchase would be secure against the claim of the creditors, in the event of insolvency of McArthur, so that he would, in no event, be forced to pay more than $35 for the common and $100 for the preferred, the determinable question remained whether or not such a contract was tendered, or prepared as would meet this condition, so that, in the exercise of good faith, it was incumbent on Faw to accept it. This

question we answered in the negative, holding not only that the contract prepared by counsel for McArthur did not meet the approval of his legal advisers; but that it did not, in our judgment, afford Faw the essential and stipulated protection against the creditors of McArthur in event of his insolvency. It was on this ground that we held that Faw did not become bound and that a decree for specific performance was not authorized.

 Despite the earnest and extended argument of learned counsel for petitioners, we are constrained to adhere to our opinion unanimously arrived at after careful consideration and consultation. We disclaimed an intention to charge either party with a purpose to defraud creditors, but that the manifest purpose of the proposed contract was to hinder and hold off future creditors cannot be successfully denied, and under authorities cited this was in contravention of the Fraudulent Conveyance Statute (Code, Section 7277) as construed in *M. & N. Freight Lines* v. *Kimbel Lines,* 180 Tenn. 1, 170 S. W. (2d) 186. In other words if the proposed contract did not protect Faw against creditors of McArthur in event of his insolvency, it did not perform the essential function demanded by Faw. If it did this then it was void for the reasons stated.

In a supplemental brief it is urged that, in any event, oral re-argument should be allowed upon the question of the applicability of the Fraudulent Conveyance Act to the proposed continuing option agreement, this particular theory having been first advanced in the opinion of the Court. While neither this, nor other grounds of invalidity suggested in our opinion had been specifically noted in the able arguments and briefs of counsel, the defense of invalidity of the proposed contract was directly made and argued. This Court has merely sug-

gested additional reasons for the view that a contract had not been and could not be drawn which would protect against the claims of creditors of either party in case of insolvency. An extended discussion has been submitted by counsel of these questions in these petitions before us, and we are not of opinion that the Court could be further aided by oral argument.

The petition to rehear must be dismissed.