**Abbie P. WALDRON and Phoebe P. Davis, Co-Conservators of Phoebe T. Peay, Plaintiffs-Appellants**

v.

**COMMERCE UNION BANK, Defendant-Appellee.**

Court of Appeals of Tennessee, Middle Section.

Aug. 25, 1978.

Rehearing Denied Sept. 21, 1978.

Certiorari Denied by Supreme Court Feb. 26, 1979.

Fred E. Cowden, Jr., Nashville, for plaintiffs-appellants.

Charles C. Trabue, III, Trabue, Sturdivant & DeWitt, Nashville, for defendant-appellee.

## OPINION

LEWIS, Judge.

This is an appeal by plaintiffs-appellants, Abbie P. Waldron and Phoebe P. Davis,

Co-Conservators of Phoebe T. Peay, from the dismissal of their suit against defendant-appellee, Commerce Union Bank.

We adopt the first 16 paragraphs of the Chancellor's excellent memorandum which succinctly set out the facts:

"In this case the conservators of Phoebe T. Peay, an incompetent, have sued Commerce Union Bank contending that the bank is liable for releasing the corpus of a trust to Mrs. Peay. The bank contends that since Mrs. Peay was both the grantor and the beneficiary, she had absolute control over the corpus and could dispose of it as she saw fit. The resolution of the controversy centers around the effect of a letter, signed by Mrs. Peay, and attached to the trust instrument, which directed that the bank allow no withdrawals from the corpus of the trust unless approved by either one of Mrs. Peay's daughters, Abbie or Phoebe.[1]

"Mrs. Peay had inherited securities valued at slightly over $100,000.00. In March 1974, due to her inexperience in financial matters and her family's long-standing relationship with Commerce Union (her father was a bank director), she created a revocable trust with Commerce Union as the trustee and herself as the beneficiary. The instrument is a brief standard form document prepared by the bank, and it provided that the bank would invest her funds and pay the income to her. She had absolute power to terminate the trust at any time she desired.

"Mrs. Peay had a history of alcoholism and within a few weeks after creating the trust she disappeared and was later found intoxicated in New Orleans, having paid a Nashville Cab driver to transport her. She was returned to Nashville where she spent a month in Madison Hospital. Two of her daughters, Abbie and Phoebe, now her conservators, filed a petition in Probate Court to have Commerce Union appointed her conservator. On the day of the hearing, the daughters withdrew the petition and no

1. For clarity, the daughters will be referred to by their first names. Abbie Peay was Abbie P. Waldron when suit was filed and when all of the relevant transactions occurred. Her first husband, Waldron, is deceased and she has since remarried and her married name is Abbie Peay Glover. Phoebe Peay's married name is Phoebe Peay Davis.

conservator was then appointed. On that date the daughters met for the first time Kirk Scobey, the bank trust officer who supervised Mrs. Peay's account, and made arrangements to meet with him to learn more about their mother's trust.

"The meeting occurred at the bank on June 12, 1974 with Mrs. Peay, her two daughters, and Scobey present. What transpired is in dispute. According to Abbie, she and her sister were concerned about the possibility of their mother squandering her money since she had spent $5,000.00 on her New Orleans outing. Abbie had prepared a power of attorney to be executed by her mother and took it to the bank for the meeting to inquire of Scobey if the giving of the power of attorney to Abbie would have the effect of allowing Abbie and her sister control over the withdrawal of trust funds by Mrs. Peay. Abbie and Phoebe are positive that Mrs. Peay's alcoholism was discussed at the meeting and it was explained to Scobey that Mrs. Peay needed protection from her own indiscretion. Scobey, according to Abbie, advised that the power of attorney would not have the desired effect and he prepared another document for Mrs. Peay to execute. That letter, signed by Mrs. Peay, stated as follows:

Commerce Union Bank
Nashville, Tennessee

Re: Tr. U/A Phoebe T. Peay

Gentlemen:

With regard to my Trust, dated March 15, 1974, with you, I direct you to pay income monthly and send such checks to 3610 Hewlett Court, Nashville, Tennessee 37211. I further direct that you allow no withdrawals from the corpus of this Trust unless such is approved by Abbie P. Waldron or Phoebe Peay Davis.

/s/ Phoebe T. Peay
Phoebe T. Peay

"Abbie and Phoebe insist that Scobey advised them that before Mrs. Peay could withdraw trust corpus, she would have to have the signed approval of both daughters. He told them they were wise to have Commerce Union remain as a trustee because as

a corporate, non-family entity, the bank could easier resist Mrs. Peay's attempts to withdraw funds should she resume her abusive drinking habits and seek to make withdrawals. Scobey, according to the daughters, said nothing about the trust being revocable at the will of Mrs. Peay. The two young women, both in their 30's and not knowledgeable about such matters, testified that they left the bank secure in the knowledge that their mother's money would be safe from her own indiscretion.

"Scobey's recollection of the meeting differs substantially from that of the daughters. He testified that he first explained to the daughters the nature of a 'grantor trust,' the duties of the trustee, and the fact that it was a devise to utilize the bank's common trust fund to provide income for Mrs. Peay. He has no recollection of any discussion of Mrs. Peay's chronic alcoholism and is confident that he would recall such conversation if it had occurred. Had there been any intent to amend the trust instrument and make it irrevocable, then a formal amendment would have been required and it would have to have been executed by Mrs. Peay and the bank. Scobey has no recollection of being asked by Abbie if the power of attorney she drafted would tie up Mrs. Peay's funds.

"Scobey's dominant recollection of the meeting is that Mrs. Peay was about to move into a duplex adjoining Abbie and that she wanted her daughter to look after her affairs and to be aware of what she was doing with her money. Even though the letter he drafted for Mrs. Peay says that the bank is directed 'to allow no withdrawals from the corpus of this trust unless such is approved by Abbie P. Waldron or Phoebe P. Davis,' Scobey states that the purpose of the letter was simply to insure that the daughters would be advised if Mrs. Peay were to make a withdrawal.

"Scobey acknowledges that he knew about the New Orleans 'drinking junket' and the Madison Hospital stay, but he did not know Mrs. Peay had a history of prior drinking problems and knew of no urgency about the drinking, especially in light of the

withdrawal of the conservatorship petition on the day of the hearing. In his many conversations with Mrs. Peay after June 12, he states that he never had one with her during which she appeared to be intoxicated.

"A power of attorney was prepared and executed by Mrs. Peay at the June 12 meeting. It directs that the daughters close her personal bank accounts and deposit all monies into a joint account in their names. It states that the daughters are to manage any and all monies payable to Mrs. Peay or due her through 'contracts, agreements, dividends and trusts.' (Ex. 2). The daughters then established what they term a 'power of attorney account' in which they deposited income from a trust different from the one involved in this suit. The daughters then began to pay her bills and give her a weekly allowance.

"As contemplated, Abbie and Mrs. Peay occupied adjoining units in a duplex on Faulkner Drive. By July, Mrs. Peay had resumed her drinking and began associating with a collection of undesirable characters. Abbie moved out of the duplex and from time to time attempted to check on her mother, but was usually forced to leave her mother's apartment by one of the rogues at Mrs. Peay's.

"On July 24, Mrs. Peay called Scobey and instructed him to send her mail, which included her monthly income checks and bank statements, to her address on Faulkner Drive rather than the Hewlett Court address of Abbie's in-laws. She told Scobey that she was no longer living with Abbie and that her daughters were no longer involved in her affairs. On September 16, 1974, Mrs. Peay attempted to cash a $3,000.00 check at the Nolensville Road branch of Commerce Union. After being advised by Buddy R. Dukes, the branch manager, that she had insufficient funds for the check, Mrs. Peay telephoned Scobey. She told Scobey that she wanted to withdraw the $3,000.00 from the corpus of her trust. Scobey reminded Mrs. Peay that she had decided that she wanted her daughters to have control over her expenditures. Mrs.

Peay advised Scobey that she no longer wanted her daughters to have anything to do with her affairs and that she was revoking the power of attorney. She instructed Scobey not to discuss her affairs with her daughters. Scobey requested that Mrs. Peay send a written verification of her decision. He later received an undated letter from Mrs. Peay confirming the September 16 telephone conversation regarding the $3,000.00 and instructing him to 'revoke the power of attorney new held by Abbie P. Waldron.' (Ex. 19)

"Scobey and the branch manager Dukes worked out an arrangement whereby when Mrs. Peay came to cash checks and had insufficient funds, Scobey would have the necessary money transferred from the corpus of the trust into Mrs. Peay's checking account. On October 4, 1974, Scobey sent Mrs. Peay a letter in which he confirmed her stated desire to make an additional withdrawal and asked her to sign a copy of the letter authorizing him to make subsequent transfers from the corpus of the trust to the checking account. Mrs. Peay signed a statement which followed:

" 'In accordance with the terms of my trust with you, I direct you to transfer funds from my trust to my checking account whenever such transfers are needed to cover overdrafts.

/s/ Phoebe T. Peay

"As a result of this arrangement, Mrs. Peay would go to the Nolensville Road branch and cash checks. According to Dukes, on the occasions when he saw Mrs. Peay, she was intoxicated and usually was in the company of one or more disreputable characters. On her second or third visit to withdraw funds, Dukes became worried about Mrs. Peay and tried to discuss the withdrawals with her. She told Dukes that her financial matters were none of his business, that she only had a few months to live, and that she could spend her money as she wanted. Usually, she would inform Dukes that she was withdrawing the money to use for travel, to buy boats, to buy cars, to make gifts, or to make investments. Scobey was told by Dukes what Mrs. Peay

said she was using the money for and Scobey was also told that she was intoxicated when the withdrawals were made. Dukes asked the trust officer if there was anything that could be done about her wateful spending habits and Scobey advised Dukes that there was not, that in the type of trust she had she could spend all the money at any time, at her request. At no time were the daughters ever notified of these withdrawals.

"On one occasion, Mrs. Peay sought to withdraw $20,000.00 for an investment in a nightclub operation with one of her seedy associates. Scobey questioned Mrs. Peay about the investment and even consulted with Mrs. Peay's brother, an attorney.

"Mrs. Peay continued on her spending binge throughout the balance of 1974 and into January of 1975. She purchased several automobiles and apparently gave them to the rogues with whom she was consorting. Several of the large checks are simply made out to cash and indorsed by her new friends. Between September 16, 1974 and mid-January 1975, Mrs. Peay withdrew over $100,-000.00 of the corpus of her trust and spent in (sic) in what appears to be a most frivolous manner. She took up residence with another daughter after her funds were exhausted, and in May Mrs. Peay was declared incompetent by the County Court of Williamson County and Abbie and Phoebe were appointed her conservators. Mrs. Peay now suffers from organic brain damage and was unavailable to testify in this cause."

Plaintiffs have assigned three (3) errors.

(1) "The Chancellor erred in holding that Phoebe T. Peay had the power to partially terminate her trust by making withdrawals of corpus subsequent to June 12, 1974, without the consent of one or the other of her two daughters. This was

error because the letter of June 12, 1974 constituted an amendment to the trust which had the effect of converting it from a revokable trust to a trust revokable only with the consent of a third party."

(2) "The Chancellor erred in holding that the act or acts of Phoebe T. Peay on or near September 16, 1974 constituted a revocation of the trust amendment of June 12, 1974. This was error because (1) her undated letter following the phone conversation of September 16, 1974 with Mr. Scobey did not constitute a plain, clear and unequivocal intention on her part to terminate or revoke the amendment to the trust, and (2) the statements allegedly made by Mrs. Peay in her phone conversation with Mr. Scobey, even if admissible, likewise did not constitute a plain, clear and unequivocal intention on her part to terminate or revoke the amendment to the trust."

(3) "The Chancellor erred in exonerating Commerce Union Bank for the multiple acts of negligence of its Trust Officer, M. Kirk Scobey."

We discuss the first two assignments together.

It is not necessary to determine if the June 12, 1974 letter amended the trust, since even assuming that it did Mrs. Peay was the sole beneficiary of the trust and could therefore compel its termination either in whole or in part.

"If the settlor is the sole beneficiary of a trust and is not under an incapacity, he can compel the termination of the trust, although the purposes of the trust have not been accomplished." *Restatement* (2d), Trusts, § 339.

The comment on this section is set out in the footnote.[2]

2. "a. Scope of the Rule. The rule stated in this section is applicable although the settlor does not reserve a power of revocation, and even though it is provided in specific words by the terms of the trust that the trust shall be irrevocable. It is applicable although the purpose of the Settlor in creating the trust was to prevent himself from mismanaging the proper-

ty. It is applicable although by the terms of the trust, it is provided that the beneficial interest should not be transferable or subject to the claims of creditors since a restraint on the alienation of the beneficial interest is ineffective where the beneficiary is the settlor.

"If the settlor is not under an incapacity at the time when he creates the trust, but he

 By the great weight of authority it is held that a settlor who is the sole beneficiary of a trust and is not under a legal incapacity can revoke the trust even though the purposes for which he created it may have been to preclude him wasting his own assets. The suggestion that if in a moment of wisdom he has created a trust for his own protection, he should not be allowed in a moment of folly to deprive himself of that protection is imaginary. He has no protection against his own folly since his interest under the trust may be assigned by him or reached by his creditors. He cannot create a spendthrift trust for his own benefit. *McArthur v. Faw,* 183 Tenn. 504, 518, 193 S.W.2d 763 (1945); *Rose v. Third National Bank,* 27 Tenn.App. 533, 183 S.W.2d 1 (1944). "At any rate, regardless of his wisdom or folly in creating the trust, since nobody but he has at any time any beneficial interest in the property, he should be permitted to do as he likes with it, if he is not under a legal incapacity." *Scott, The Law of Trusts,* § 339, p. 2699 (3d).

The rule, as will be noted, is subject to the condition that the settlor not be under a legal incapacity at the time of termination.

The plaintiffs assert that their mother was an alcoholic and that acute alcoholism can render a person legally incompetent.

Prior to May 15, 1975, when Mrs. Peay was adjudicated mentally incompetent, so far as the defendant knew Mrs. Peay was under no legal incapacity.

Mr. Scobey knew of Mrs. Peay's trip to New Orleans and her stay at the sanitarium but did not know she had a drinking problem. He was present at the courthouse the day Abbie and Phoebe voluntarily withdrew the petition to have a conservator appointed for their mother. If Mr. Scobey had suspected a problem, Abbie and Phoebe's actions would have been sufficient to dispel his suspicions. In Mr. Scobey's conversations with Mrs. Peay after June 12 she never appeared to him to be intoxicated.

While there is proof that Mrs. Peay made withdrawals from the corpus of the trust while she was in some degree intoxicated, it does not appear from the record that her drunkenness was excessive so that she was deprived of the use of her reason and understanding. See *Belcher v. Belcher,* 18 Tenn. 121.

Plaintiffs contend that Tennessee does not adhere to the majority rule and, in support, cite *Guion v. National Bank of Commerce,* 31 Tenn.App. 540, 218 S.W.2d 739 (1948).

Mr. Guion was adjudged to be non compos mentis in 1907 and committed to Western State Hospital. He remained a "technical inmate" until 1937 (He had been allowed to come and go almost at will.) when he filed his petition to be released. In his petition, he alleged that while he was capable of self-control he did not feel his large estate should be turned over to him and that it should continue under a guardianship.

In 1939 he filed a petition for complete restoration to sanity but stated that on account of his lack of experience and ability to manage business matters he had executed an irrevocable trust. Subsequently, an order was entered approving the trust and restoring his competency. In January 1944 he filed a bill alleging that he was coerced into signing the trust agreement since the Probate Court would not remove his disability until he had signed the agreement and, therefore, the trust was neither binding nor irrevocable.

---

subsequently becomes under an incapacity, he cannot therefore terminate the trust. Thus, if the settlor becomes insane or is judicially declared a spendthrift, he cannot terminate the trust. The mere fact, however, that he is a person who is unable wisely to manage or dispose of his property does not preclude him from terminating the trust and compelling the trustee to re-transfer the trust property to him if he is the sole beneficiary of the trust; and it is immaterial that his purpose in creating the trust was to put the management of his property out of his own hands, because of his fear that he would mismanage it and to protect himself against his own incompetence, wasteful habits or intemperance. He can terminate the trust, if he is not under an incapacity, because he is both the settlor and the sole beneficiary." Comment a., *Restatement* (2d), *Trusts,* § 339.

The Chancellor, after hearing, found that the Probate Court would not have removed his disability unless the trust had been executed and that his mental condition at the time of the hearing was the same that it was on May 9, 1939, i. e. such that he was not competent to handle his affairs. No appeal was taken and in 1945 a "supplemental" bill was filed, praying for revocation of the trust.

The Chancellor entered a final decree denying revocation of the trust because Mr. Guion was incompetent (specifically finding that his mental capacity was that of a child of 12 years).

In *Guion* there had been an adjudication of incompetency. Later his disability was removed on the condition that he agree to put his estate in an irrevocable trust. He was not thereafter permitted to revoke the trust because the Court found he was incompetent. We see no conflict with the majority rule. The majority rule is subject to the condition that the settlor-beneficiary must not be under a legal incapacity at the time of termination.

■ The plaintiffs are co-conservators for their mother. As such, they stand in the shoes of their mother and this suit is, in effect, a suit by Mrs. Peay to hold the defendant liable for breach of the terms of the trust agreement. Even if the trust had become irrevocable and the withdrawals by Mrs. Peay from the corpus of the trust were in violation of the terms of the trust, there could still be no recovery against the trustee. A beneficiary who was under no incapacity and who fully consented to an act of the trustee in wrongfully allocating or distributing trust assets cannot hold the trustee accountable or deny the trustee credit for funds thus disposed of. *Knox County v. Fourth and First National Bank,* 181 Tenn. 569, 182 S.W.2d 980, 989 (1944). Mrs. Peay not only consented, she requested the withdrawals.

During the time the withdrawals were being made Mrs. Peay was not confined. She lived alone, maintained her own checking account, had her own automobile, bought her own groceries, cooked her own meals, came and went as she pleased and incurred certain debts which the plaintiffs recognized as valid.

We are not cited to any proof in the record nor are we able to glean any that Mrs. Peay did not understand the nature and effect of her actions. The testimony was that she did understand what she was doing, that she fully intended to act precisely as she did despite being warned of the consequences of her actions by at least one of defendant's employees. There is no proof that Mrs. Peay was under a legal incapacity when the requests were made.

■ The trust agreement between Mrs. Peay and the defendant specified no special mode of revocation. Mrs. Peay could revoke in any manner sufficiently manifesting an intention to revoke. *Restatement* (2d) Trusts, § 330, Comment i.

Assignments (1) and (2) are overruled.

We next discuss plaintiffs' third assignment.

■ Plaintiffs complain that the defendant negligently placed an interpretation upon the trust agreement which was contrary to the interpretation they placed upon it. They say they were assured at the time of the execution of the June 12, 1974 modification (if such it be) that the corpus of their mother's trust was now safe from her own encroachments since she could obtain the money only with the consent of one of them. There is no evidence that the defendant ever had any knowledge of a contrary interpretation placed upon the agreement by plaintiffs. As the Chancellor so aptly points out in his memorandum, what Abbie and Phoebe thought is irrelevant, since they were not a party to the agreement between defendant and Mrs. Peay. There is no evidence that the parties to the trust agreement ever interpreted it as being irrevocable.

They say it was negligence on the part of the defendant in failing to notify them of the withdrawals. The uncontradicted testimony was that Mrs. Peay instructed Mr. Scobey not to discuss her financial affairs

with her daughters. She was the bank's customer and as such they felt they owed a duty to follow her wishes. As we have said earlier, there is no proof that the defendant knew prior to May 15, 1975 that Mrs. Peay was under any incapacity.

In order for there to be a recovery on the theory of negligence, it must be proven by the plaintiffs that the defendant owed a duty and that it breached that duty. In this instance the duty which the defendant owed was to Mrs. Peay. The proof is that it acted at the request and direction of Mrs. Peay.

We adopt the following from the Chancellor's memorandum.

"Notwithstanding the bank's sloppy handling of the matter, the bank is not liable. The bank's customer was Mrs. Peay and this suit is brought as if she were the plaintiff. The Court cannot conclude that Mrs. Peay ever desired to create a permanently irrevocable trust. While that may have been the daughters' desire, they were not the bank's customers. Since it is not shown that Mrs. Peay wanted an irrevocable trust to be created, the bank cannot be estopped by any failure to create such a trust. The trust arrangement may have been exactly as Mrs. Peay desired it to be, and since the contrary has not been clearly shown, the bank is not liable on this issue.

"Even if the Court were to find the bank liable, it would be difficult to ascertain the amount of damages. Mrs. Peay, through her conservators, is seeking to recover from the bank funds which Mrs. Peay has already received. To require the bank to pay this money to Mrs. Peay twice would necessitate a finding by this Court that the use of the funds by Mrs. Peay were utterly without any value to her. This would require a most subjective decision by this Court as to the merit or lack of merit of her expenditures. According to the bank branch manager, Mrs. Peay thought she had only six months to live and chose to spend her funds buying cars for her new friends, taking them to Las Vegas, and making unwise investments. While such expenditures may appear frivolous to the average person, it would be difficult for this Court to substitute its personal judgment about such expenditures for that of Mrs. Peay. What is a frivolous expenditure to one person is certainly not necessarily a frivolous expenditure to another. If Mrs. Peay believed that she had only a few months to live, chose to spend over $100,-000.00 in the manner in which she did and derived pleasure from it, it would be most difficult for a court to conclude that she should be entitled to recover that amount from the bank which released her own money to her."

All assignments are overruled, the judgment of the Chancellor is affirmed. Costs are taxed to the plaintiffs.

SHRIVER, P. J., and TODD, J., concur.

SHRIVER, Presiding Judge, concurring.

It is with great reluctance that I concur in the Opinion whereby the judgment of the Trial Court is affirmed in dismissing the complaint.

It seems to me that the Trust Officer of the defendant Bank was clearly negligent in the handling of the trust fund. In view of all the circumstances shown by the record he should have come to realize that Mrs. Peay was incompetent to make rational decisions concerning withdrawals of large sums from the corpus of the Trust, having in mind the purpose of creating the Trust in the first place, and, especially after the Trustor signed an agreement that future withdrawals would require the written concurrence of one or both of her daughters.

At the very least the Trustee should have notified the daughters before honoring the repudiation of this agreement that was obviously made for Mrs. Peay's protection against improvident withdrawals and expenditures due to intoxication or otherwise.

In recognition of the legal difficulties pointed out by the learned Trial Judge in trying to find a way to sustain the complaint, I feel compelled to concur in an affirmance of the judgment below.